

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

APR 16 2019

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
    DEPUTY CLERK

IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID **100003234932941** THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 4:19MJ00012<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew S. Marlowe, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2. I am a Special Agent with the Federal Bureau of Investigation. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Specifically, I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March

2012. I received initial training and instruction to become a Special Agent at the FBI Academy located in Quantico, Virginia, which included training concerning violations of the United States criminal statutes.  I am currently assigned to the Richmond Division of the FBI, Lynchburg Resident Agency. I am presently and have been previously assigned to investigate a variety of criminal matters, to include violent criminal acts, gangs, and drug investigations. Further, I have experience and training in a variety of investigative and legal matters, including the topics of lawful arrests, the drafting of search warrant affidavits, and probable cause.  While serving within my capacity at the FBI, I have authored search warrants concerning various federal criminal violations.  I have investigated cases where electronic communications to include social media platforms and cellular telephones have played an integral role in the investigations.  Through experience and training received, I have become familiar with how the usage of electronic devices and social media applications has become commonplace throughout the "criminal world."  I have also become aware that information stored at the service provider facilities and on cellular devices themselves can assist law enforcement in criminal investigations.

      3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

      4.     Based on the facts set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 18, United States Code, Section 1512(a) (Witness Murder), Title 18, United States Code, Section

1959 (Violent Crimes in Aid of Racketeering), and Title 18, United States Code, Section 924(c) (Possession of a Firearm During a Crime of Violence), as described in Attachment B.

**PROBABLE CAUSE**

5.      On June 11, 2018, a federal Grand Jury indicted members of the Rollin 60s Crips street gang, the Milla Bloods street gang, and gang associates on violations of Title 18, United States Code, Section 1962 (Racketeer Influenced and Corrupt Organizations Act); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); and a variety of other charges, including obstruction-related offenses. The Court issued arrest warrants for the individuals, and they were arrested.  Those cases are captioned *United States v. Davis et al.*, 4:18-cr-11, and *United States v. Anthony*, et al., 4:18-cr-12 ("Bloods Indictment").  The Grand Jury issued a First Superseding Indictment in *United States v. Davis et al*, 4:18-cr-11, on November 6, 2018 ("Crips Indictment").

6.      This investigation revealed that on June 15, 2016, members of the Rollin 60s Crips street gang and Milla Bloods street gang coordinated and attempted to murder Dwight Montel Harris and Armonti Devine Womack, who are known as the "Philly Boys." Specifically, W-1, who was present and participated in the incident, has testified that members of both gangs arrived at North Hills Court apartment complex in Danville, Virginia, planned to murder the Philly Boys as they stood in a nearby parking lot, covered their faces, armed themselves, and walked into the parking lot before firing repeatedly at the Philly Boys. W-2, who was also present, has stated that W-2 was standing in the parking lot, talking to the Philly Boys, when the shooting occurred. Both W-1 and W-2 have identified some of the shooters. Womack was injured in the shooting.

7. The Danville Police Department interviewed Harris and Womack after the shooting. Charges related to this incident are included in the Bloods Indictment and Crips Indictment. Both Harris and Womack are named victims in the indictments.

8. Based on this information, part of which was provided as witness testimony before a federal grand jury, the United States has repeatedly tried to locate Harris and Womack so that they could testify before the grand jury in the investigation that led to the Bloods Indictment and Crips Indictment. Both are witnesses to the June 2016 shooting in which they were victims.

9. On October 23, 2018, at approximately 4:58 p.m., Harris was shot multiple times and killed on the steps of an abandoned house at 629 Cabell Street, Danville, Virginia. W-3 is a friend of Harris, who was present during the murder. W-3 stated to Harris's parents in the hours right after the murder (statements which were heard and audio recorded by Danville Police Department officers) that Harris had been contacted on his cellphone by an unidentified individual, requesting that Harris sell him/her a half pound of marijuana. Harris's cellular telephone was identified as (434) 441-5315. Harris and the individual communicated by voice calls and text messages to coordinate the drug transaction. W-3 drove Harris to the location of the drug sale. W-3 further stated that at the location of the drug transaction, W-3 saw multiple young black males on the porch of an abandoned house and in the front yard. Harris walked up to the porch, "dapped" the individuals, and appeared to engage in a hand-to-hand drug transaction. At the conclusion of the transaction, these multiple black males pulled out firearms and open fired on Harris, killing him. W-3 returned fire before driving away from the scene where Harris lay dead. Ballistics and firearms found at the crime scene corroborate W-3's statements, as do the statements of individuals who witnessed certain events after the murder.

10. A witness reported to the Danville Police Department officers that Harris was murdered because he was a "snitch" in the federal cases.

11. In October 2018, Harris's cellular telephone records were obtained by law enforcement from the service provider T-Mobile. The telephone records indicated that Harris communicated with the individual who utilized cellular telephone number of (434) 228-5148. Further, Harris communicated with the individual multiple times throughout the day of October 23, 2018, and minutes before he was murdered on the same day.

12. Law enforcement queried jail call records for (434) 228-5148, and the results revealed a call that occurred on October 16, 2018, approximately a week before Harris's murder. The call was associated with an inmate that was incarcerated at the Danville City Jail. The inmate was identified as Wyshawn Brandon, who is the brother of Wydarius Brandon. The records indicate that while incarcerated Wyshawn Brandon called (434) 228-5148. During the call Wyshawn Brandon congratulated the caller and then asked the caller what he was doing. The caller responded, "Chillin with Mygenika ass." This information is consistent with publicly accessible postings on Facebook that confirm that Mygenika Guy and Wydarius Brandon are close associates.

13. In addition, a reliable, longtime confidential informant has provided information to the Danville Police Department that he was with W-4. While W-4 was in the presence of the informant and several unidentified individuals, W-4 stated that his girlfriend's daughter set up the drug transaction that lured Harris to the steps of the abandoned house at 629 Cabell Street, Danville, Virginia, and that the daughter's boyfriend (Wydarious Brandon, an unindicted Milla Bloods gang member) and his friend (another unindicted Milla Bloods gang member) were two of the shooters.

14. W-5 lives about two blocks from the location of the murder. W-5 testified before the grand jury that he was in his house at the time of the shooting, and that his girlfriend told him that she heard gunshots, and that, a few minutes later, he saw three black males hurrying through his neighbor's backyard, near the home of Earlquan Williams. He identified one of the black males as his neighbor, who is Earlquan Williams (an unindicted Milla Bloods gang member); W-5's physical description of this individual also matches Williams. One of the other black males is described as slim, with shoulder length, red-colored dreads, which matches the description of Wydarious Brandon (an unindicted Milla Bloods gang member), who lives two doors down from the location of the murder.

15. In January 2019, law enforcement executed a search warrant on Facebook for Wydarious Brandon's Facebook account, User ID 100001444875409, url www.facebook.com/wydarius.brandon, with profile name Wydarius Raquan Brandon.

16. Brandon's Facebook account revealed communications between Wydarious Brandon and others on Facebook. In particular, Facebook account 100027358425550, profile name of Vig Merlino, messaged Brandon stating, "R said what's yo #." Brandon replied stating, "4342285148." It is believed that Brandon was the individual communicating with Harris throughout the day of October 23, 2019, and minutes before Harris was killed.

17. Additionally, Facebook account **100003234932941**, profile name Peachie Coles, Facebook url www.facebook.com/johntavis.coles (herein, "Cole's Account"), was identified during the review of Wydarious Brandon's Facebook communications.

18. On October 22, 2018, the day before the murder of Harris, Cole's Account messaged Wydarious Brandon the cellular telephone number of "4344415315," which was

Harris's number. The individual who utilizes the Cole's Account has been identified as Johntay Edmund Cole.

19. Law enforcement believes that Facebook still maintains possession of the information associated with Cole's Account. Cole's Account, specifically his private Facebook Messages, may contain evidence which corroborates or contradicts grand jury testimony or information that witnesses provided law enforcement during the investigation. The information could also lead to the identity of additional suspects, witnesses in the murder, or photographs thereof, such as providing locational data for posts and other entries that permit law enforcement to identify how Cole may have obtained Harris's cell phone number and why he sent Harris's cell phone number to Wydarious Brandon. The information may reveal whether or not Cole facilitated the murder of Harris. Further, it could reveal the identities of others with whom Cole was communicating before and after the murder, including the content of those communications. For instance, it may lead to evidence proving or disproving Cole's knowledge of any plan to murder Harris and if Cole was in direct contact with Harris before he was killed.

20. The contents of Cole's Account could also demonstrate if he is a member of a gang or associated with any gang, such as the remaining unindicted Milla Bloods who are targets of the murder investigation. For example, based on our investigation in the related gang investigation (that led to the Milla and Crips Indictments), videos and photographs in Facebook account can demonstrate and help law enforcement identify co-conspirators and associates, as well as prove if an individual is a member or associate of a gang (e.g., group photographs with individuals using gang signs). Therefore, it is respectfully submitted that probable cause exists that the data maintained and stored at the premises of Facebook associated with the Facebook user ID **100003234932941,** will lead to evidence, fruits, or instrumentalities of the crime and

could assist in identifying additional witnesses and suspects that were involved with Harris' murder.

**Information about Facebook**

21.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

22.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

23.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

24. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

25. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

26. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been

deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

27. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

28. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

29. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

30. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

31. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The

activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

32. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

33. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

34. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

35. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g.,

information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

37. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

38. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **CONCLUSION**

39. Based on the forgoing, I request that the Court issue the proposed search warrant.

40. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

```
Received by reliable electronic
means and sworn and attested to
by telephone on April 16, 2019.
```

Respectfully submitted,

*Matthew S. Marlowe*

Matthew S. Marlowe
Special Agent
Federal Bureau of Investigation

~~Subscribed and sworn to before me on~~ xxxxxxxxxxxxxxxxxxxxxxxx ~~2019~~

*Joel C. Hoppe*
THE HONORABLE JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

14